UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: ) | | |
| MAHESH AGRAWAL ) | | CASE NO. 20-30242 |
| ) | | |
| DEBTOR ) | | |
| ) | | |

| | | |
|---|---|---|
| WILSON & MUIR BANK & TRUST ) | | |
| COMPANY ) | | |
| ) | | |
| PLAINTIFF ) | | |
| ) | | |
| VS. ) | | ADVERSARY PROCEEDING |
| ) | | NO. 20-3018 |
| ) | | |
| MAHESH AGRAWAL ) | | |
| ) | | |
| DEFENDANT ) | | |

**MEMORANDUM OPINION**

This matter is before the Court after the conclusion of a trial on the merits of the cause of action under 11 U.S.C. § 523(a)(2)(B) filed by the Plaintiff, Wilson & Muir Bank & Trust Company ("WMB"), against the Defendant, Mahesh Agrawal ("Debtor"). In its complaint, WMB seeks to hold the debts owed to it by the Debtor nondischargeable. Both WMB and the Debtor appeared at trial and were represented by counsel. At the trial, the parties presented evidence, both written and documentary. Upon consideration of the evidence presented, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Fed. R. Bank. P. 7052.

**FINDINGS OF FACT**

Debtor is a 71 year old retired physician. During the course of this bankruptcy and adversary proceeding, he retired from working due to several medical conditions, which among other things, prevents him from driving a vehicle. While Debtor is highly educated, he is not a sophisticated

businessman. He is married to Nirmala Agrawal ("Nirmala"), and has two sons, with one son named Nirmesh Agrawal ("Nirmesh").

In a previous transaction unrelated to the matter currently before the Court, Debtor, in the course of obtaining financing from WMB, submitted a Personal Financial Statement dated August 6, 2014 (the "2014 PFS"). In the 2014 PFS, Debtor was required to list his assets and liabilities. In his list of assets, he listed $3,025,600 in "IRA or Other Retirement Account." He also listed real estate with a value of $600,000 and $806,008 for cash surrender value for life insurance.

In early 2016, Debtor decided to assist the corporation formed by Nirmesh, along with Shawn Ward and Stephen Corbett, called Louisville Eats Good LLC. ("Louisville Eats Good"). That entity operated the upscale Phoenix Hill restaurant Ward426. In 2016, in need of financing, Louisville Eats Good approached WMB to borrow money. WMB agreed to loan funds to Louisville Eats Good, but only if Debtor would sign a personal guaranty securing the loan and only if the Debtor supplied a personal financial statement. To assist Nirmesh, the Debtor agreed to sign a Commercial Guaranty and to provide WMB a financial statement, disclosing his relevant assets and liabilities.

The Debtor provided a Personal Financial Statement to WMB on January 27, 2016 (the "2016 PFS"). Like the 2014 PFS, this financial statement was on a form created by WMB and it called for the Debtor to list assets and liabilities. The Debtor filled out this financial statement himself, without the assistance of his attorney or accountant. On page one of this 2016 PFS, the Debtor listed several assets, including real estate valued at $500,000 and cash value of life insurance at $800,000. He also listed the following assets: Glenview Trust valued at $1,600,000 and Unified Trust valued at $1,200,000. Page 2 of the 2016 PFS called for the Debtor to elaborate on the assets

listed on page one. With respect to the real estate, the Debtor listed the address where he lived, but he also listed that the property was titled in the name of Nirmala. In the column titled "% of Ownership," Debtor listed 100%.

With respect to the life insurance, the Debtor listed three separate policies. The first was with Mass Mutual, with a cash surrender value of $680,000. A second policy with Liberty Mutual was listed with a cash surrender value of $170,000. Finally, a third policy with ING was listed, with no cash surrender value. This third policy was a term policy. Notably, with regard to the first two policies with cash surrender values, the Debtor listed the beneficiary as "Trust." The "Trust" listed by the Debtor referred to a family trust set up by the Debtor in 1990 (the "Agrawal Family Trust"). The Debtor possessed no ownership or control over the assets of the Agrawal Family Trust.

Finally, with respect to the other assets, in the section of the financial statement for stocks, the Debtor against listed the Glenview Trust and the Unified Trust, with market values of $1,600,000 and $1,200,000 respectively.

Along with the 2016 PFS, the Debtor also provided WMB statements relating to the Glenview Trust and Unified Trust accounts. With respect to the Glenview Trust account, under the Debtor's name, the form clearly indicates it is an "Individual Retirement Account." The Unified Trust document does not use the term "Individual Retirement Account" or "IRA," but does mention the words "retirement" and "retirement Plan."

Going back to page one, the 2016 PFS indicated that the Debtor had a net worth of approximately $3,874,000. This figure is clearly incorrect in that the Debtor included assets to which he did not own. The Debtor neither owned the real estate listed, nor the cash surrender value of the life insurance policies. Debtor denied that he made any intentional misrepresentations to

3

WMB on the 2016 PFS.

Although Sam Winkler ("Winkler") was not the originating loan officer, he was the loan officer for WMB assigned to handle these loans concerning the Debtor. Winkler is an experienced loan officer with over 17 years of experience as of the trial in this matter. He testified that he closely reviewed the loan documents, including the 2016 PFS, and signed off on the loan and Commercial Guaranty. He further testified that he ran the loan by Frank Wilson ("Wilson"), the president and chief operating officer of WMB. Wilson also reviewed the documents and agreed to the loan.

Neither Winkler or Wilson noticed anything unusual about the 2016 PFS. Neither asked for more information as to the real property that was listed in Nirmala's name. WMB performed no title search on the property or took any other action to investigate the real property. In fact upon cross examination, Winkler admitted that WMB did not consider the real estate in deciding whether to approve this loan. Consequently, WMB was not interested in obtaining a mortgage on the real property.

Neither Winkler nor Wilson asked about the life insurance policies, that listed the "Trust" as the beneficiaries. Winkler testified that he saw the word "Trust" listed as beneficiary, yet he, nor anyone else at WMB, asked to see the title page or the declarations page to the policies or to actually see the Agrawal Family Trust documents. At no time did WMB take any actions, including simply asking the Debtor, to see who actually owned the cash surrender value of the life insurance policies. Winkler testified that he simply believed the Debtor owned the cash surrender values on these policies. In Winkler's deposition, given prior to trial, Winkler admitted no investigation was made into the life insurance policies. "Well, we weren't really interested in that. We just were interested in the cash he has at the Glenview and [Unified] Trust." Defendant's Exh. 12 at p. 34.

4

Finally, WMB failed to follow up or ask any questions as to either the Glenview Trust assets or the Unified Trust Assets. No one from WMB asked for more information on these assets other than what the Debtor provided, which clearly had indicia that these funds were either in an IRA or in a "retirement Plan." Winkler knew these assets were connected with the Debtor's retirement, in that he knew that due to the Debtor's age, he could access the funds. Defendant's Exh. 12 at p. 39. No explanation was provided by WMB as to why any investigation was not undertaken as to these assets. Nor was any explanation provided why WMB did not at least glance at the earlier 2014 PFS in its possession to see that these assets were likely in an exempt individual retirement account.

Based upon the information contained in the 2016 PFS, WMB agreed to lend to Louisville Eats Good. On February 15, 2016, the principals of Louisville Eats Good signed a promissory note in the amount of $635,288.24 (the "2016 Loan"). Contemporaneously, the Debtor signed a Commercial Guaranty wherein he agreed to guaranty the indebtedness owed by Louisville Eats Good on the 2016 Loan. This was a commercial transaction, made for the benefit of Louisville Eats Good, and indirectly Nirmesh.

Prior to the 2016 Loan and Commercial Guaranty, WMB had no prior relationship with the Debtor[1]. There was no business history, and while the relationship post 2016 Loan was cordial and professional, at the time of the loan, the relationship between the Debtor and WMB, Winkler, or Wilson could not be considered close or personal.

In 2017, in order to obtain additional financing for Nirmesh, the Debtor agreed to borrow funds directly from WMB. In order to obtain this additional financing, the Debtor signed another

---

[1] No evidence was ever submitted as to what became of the 2014 PFS. Nevertheless, both Winkler and Wilson both testified that WMB had no prior relation with the Debtor prior to the 2016 Loan and Commercial Guaranty.

5

financial statement (the "June 2017 PFS"). The June 2017 PFS is substantially identical to the 2016 PFS, with the only alteration being that the Debtor re-signed the document with a new date of June 21, 2017. In the June 2017 PFS, Debtor reiterated his prior representations to WMB concerning the "Real Estate," "Life Insurance," the "Glenview Trust" and the "Unified Trust." With this 2017 PFS, the Debtor borrowed $60,130. Both Winkler and Wilson reviewed these documents and approved the loan on behalf of WMB.

Finally, on September 15 2017, the Debtor obtained a loan in the principal amount of $110,000 from WMB, pursuant to the terms of a Promissory Note (the "2017 Loan"). Again, the Debtor submitted a new financial statement (the "September 2017 PFS") to WMB, which, except for some fluctuations in value and a new mortgage on the real property, was substantially the same as the previous financial statements. Unlike the 2016 PFS, the Debtor did not provide account statement from Glenview or Unified. When ask why he did not include the statements, the Debtor testified that WMB never asked for the statements.

Ward426 eventually failed and Louisville Eats Good defaulted on the terms of its Note. The Debtor testified that when he executed the Commercial Guaranty, he fully intended to honor his obligations under the Commercial Guaranty. Due to his medical conditions, however, he chose not to use his exempt retirement funds to repay the debt. Consequently, WMB brought actions against each of the principals of Louisville Eats Good, including Nirmesh, as well as against the Debtor. WMB obtained a judgment against Nirmesh and the Debtor in Jefferson Circuit Court on January 10, 2020.

On January 23, 2020, the Debtor filed for relief under Chapter 7 of the United States Bankruptcy Code. On August 5, 2020, WMB initiated this adversary proceeding seeking to except

the debts owed to it from discharge. On August 7, 2020, the Debtor received a discharge. On August 25, 2020 WMB filed two proofs of claims in this case. The first proof of claim, based upon the Commercial Guaranty, was for $545,209.36. The second proof of claim, based upon the 2017 Loan, was for $84,302.44.

## CONCLUSIONS OF LAW

I.     JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and venue is proper under 28 U.S.C. § 1409(a). The parties have submitted to the jurisdiction of this Court.

II     11 U.S.C. § 523(a)(2)(B)

WMB seeks to except the discharge of this debt under 11 U.S.C. § 523(a)(2)(B). To prevail on this count, WMB must prove each of the elements of that section of the Bankruptcy Code by a preponderance of the evidence. *In re Keeney*, 227 F.3d 679, 683 (6th Cir. 2000). The Bankruptcy Code should be construed liberally in favor of the debtor. *Id.*

Section 523(a)(2)(B) provides as follows:

> "A discharge under Section 727,...of this title does not discharge an individual debtor from any debt -
>
> (2)     for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -
>
> (B)     use of a statement in writing -
>
> (i)     that is materially false;
>
> (ii)     respecting the debtor's or an insider's financial condition;
>
> (iii)     on which the creditor knew the debtor is liable for such money, property, services, or credit reasonably relied; and

>> (iv)   that the debtor caused to be made or published with the intent to deceive..."

11 U.S.C. § 523(a)(2)(B).

Under 11 U.S.C. § 523(a)(2)(B), a debt may be declared non-dischargeable if four elements are met. First, the debtor must have obtained money or credit by use of a written statement that is materially false. Second, it must be respecting the debtor's or an insider's financial condition. Third, it must have been reasonably relied upon by the creditor. Fourth, it must have been caused to be made or published with intent to deceive. *Steier v. Best*, 287 B.R. 671, 675 (W.D. Ky. 2002); *In re French*, 563 B.R. 212, 222 (Bankr. W.D. Ky. 2016). The Court will address each of these elements in order.

A.    Written Statement That Is Materially False

With respect to the first element, there is no question that the debtor obtained money or credit by use of a written statement. The question turns to whether the 2016 PFS was materially false. While the Debtor argues that the 2016 PFS was not materially false, the Court disagrees.

The Court does not find that the written statement materially false with respect to the real estate. The statement correctly identified the title owner of the property as Nirmala Agrawal, and that she was 100% owner of the property. The 2016 PFS was also not materially false with respect to the life insurance policies. The statement correctly identified the policies, their types, their amounts, and their cash surrender values. They also correctly identified the beneficiaries being the "Trust", referring to the Agrawal Family Trust. While the statement did not list the ownership of the cash surrender values, the form provided by WMB provided no space for the Debtor to include this information. Finally, the Court does not find that the 2016 PFS was materially false as to the assets in the Glenview Trust and Unified Trust. Both assets were clearly identified as trusts.

Moreover, the attachments to each trust spoke for themselves, in that they identified that they were retirement oriented.

Nevertheless, the Court can find that the 2016 PFS was materially false in that it represented the Debtor's net worth to be over $3.8 million dollars. This figure was obviously overstated when the real estate, the life insurance cash values, and the trust assets are backed out of the net worth calculation. The Court recognizes that a cursory examination should have revealed these inaccuracies, but that does not change the fact that the statement was materially false as to the actual net worth of the Debtor.

B.   Financial Condition

Turning to the second element, that the written statement must be respect the debtor's or an insider's financial condition, there is no dispute that the 2016 PFS satisfies this element. The Debtor's financial condition was the primary focus of the 2016 PFS.

C.   Reliance

The third element requires that the creditor reasonably relied upon by written financial statement. Section 523(a)(2)(B)(iii)'s requirement has been interpreted to require the creditor to prove that it actually relied on the false statement, and that such reliance was reasonable. *Field v. Mans*, 516 U.S. 59, 68 (1995).

First with respect to whether WMB relied on the 2016 PFS, this question has a mixed answer. Clearly, WMB did not rely upon the information regarding the real property. Not only was this admitted by WMB, its actions support the conclusion that WMB had no interest in the real property. WMB never asked for a copy of the property deed, it never asked about the real property, it never ran a title report on the property, and it never asked for a mortgage on the property.

9

Likewise, there is a real question whether WMB relied upon the 2016 PFS with regard to the life insurance policies in deciding to loan funds to the Debtor. Winkler testified at his deposition that "we weren't really interested in that," referring to the life insurance policies. Winkler further testified "[we] just were interested in the cash [Debtor had] at Glenview and United [sic] Trust." Despite testimony to the contrary at the trial, the Court believes Winkler deposition testimony more accurately described WMB's position on the life insurance policies. The Glenview and Unified Trusts possessed at least $2.8 million dollars in assets collectively. For the size of this loan, it is easy for the Court to see that this would be the primary, perhaps only, security WMB relied upon when deciding to loan these funds.

The Court now turns to whether WMB's reliance was reasonable. "Reasonable reliance" is a higher standard than that of "justifiable reliance," the standard for § 523(a)(2)(A) claims. *In re Oster*, 474 Fed.Appx. 422, 425 (6th Cir. 2012). Generally, courts have held that "reasonable reliance" is a question of fact to be determined in light of the totality of the circumstances. *Buckeye Ret. Co., LLC v. Kakde (In re Kakde)*, 382 B.R. 411, 422 (Bankr. S.D. Ohio 2008) (citations omitted). The Sixth Circuit has identified five factors that may affect the reasonableness of a creditor's reliance: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations. *See Oster* at 425; *In re French*, 563 B.R. 212, 222 (Bankr. W.D. Ky. 2016); *Jennings v. Bodrick (In re Bodrick)*, 509

B.R. 843, 857 (Bankr. S.D. Ohio 2014).

In this case, WMB did not have a close personal relationship with the Debtor. While the relation post loan became cordial, both witnesses for WMB testified that the relationship between WMB and the Debtor was not a close personal relationship.

While the 2014 PFS evidences there may have been a prior loan application, no evidence was presented that this possible loan request was sufficient to give rise to a relationship of trust. As stated earlier, neither loan officer of WMB (Winkler or Wilson) testified that they were aware of the 2014 PFS when they approved the loans in question in this case. As such, the Court can easily conclude that prior loan application, assuming it even rose to that level, was sufficient to create a relationship of trust between WMB and the Debtor.

With respect to the third element, this debt was incurred for commercial reasons. WMB knew the funds from these loans were to be used by Louisville Eats Good to help its struggling restaurant. The Debtor made this fact plainly known to WMB. Both WMB witnesses testified they believe this to be a commercial loan.

The fourth element, possible red flags, strongly weighs against WMB. While the witnesses for WMB said there was nothing on the 2016 PFS to raise a red flag, this Court finds that particular testimony not credible. There were numerous items on the 2016 PFS that should have raised red flags. The reference to Nirmala with respect to the real estate should have raised a flag. The listing of a "Trust" as a beneficiary on the life insurance policies should have raised a red flag. The use of the word "Trust" with respect to the Glenview Trust and Unified Trust assets should have raised a red flag. The account statements from Glenview Trust and Unified Trust with references to either an IRA, "retirement," or "retirement Plan" should have raised a red flag. Clearly, red flags were

present on the 2016 PFS.

The fifth element, whether even minimal investigation would have revealed the inaccuracy of the debtor's representations, also cuts heavily against WMB. A minimal investigation would have revealed that the real estate was in Nirmala's name. Likewise, a minimal investigation into the life insurance policies would have revealed the owner of the policies and who held the cash surrender values. A simple request for a declarations page on the policies could have revealed the true status of the policies. Finally, a cursory review of the Glenview Trust document would have revealed these funds were held in an IRA. While the Unified Trust statement did not use the term IRA, it clearly used terms like retirement and "retirement Plan." A minimal investigation, such as a review of the trust documents, would have revealed these funds were also in an IRA. This lack of minimal investigation is compounded by the fact that the 2014 PFS clearly indicated the Debtor listed $3,025,600 in "IRA or Other Retirement Account." A minimal investigation should have shown the funds in the Glenview and Unified Trusts were of a similar retirement nature.

Taking all these elements together, the Court concludes that what reliance WMB had on the 2016 PFS was not reasonable. There were red flags on the 2016 PFS that a minimal investigation would have revealed raised questions. For reasons unexplained to the Court, WMB chose not to perform even a minimal investigation, but instead chose to rely on the terms of the statement without further investigation. Such reliance was not reasonable under these circumstances.

D.     Intent

Even if WMB had successfully proved the previous elements, it still would lose in this case because it failed to carry its burden of proof of the fourth element, that the Debtor caused the written financial statement to be made or published with intent to deceive. In making a determination as

to intent, the Court may consider the totality of the circumstances to make an inference whether the debtor submitted a false financial statement with the intent to deceive. *In re French*, 563 B.R. 212, 223 (Bankr. W.D. Ky. 2016); *In re Morrison*, 555 F.3d 473 (5th Cir. 2009). A determination of intent to deceive focuses on circumstantial evidence and is generally "inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor which indicates an intent to deceive or cheat the creditor." *John Deere Co. v. Myers (In re Myers)*, 124 B.R. 735, 741 (Bankr. S.D. Ohio 1991).

Looking at the totality of the circumstances, the Court cannot make a finding that the Debtor acted with the intent to deceive. The Court finds that the Debtor entered into these financial transactions with every intent to honor the terms of the documents. To this end, the Debtor made a good faith effort in filling out the 2016 PFS. The inaccuracies, and perhaps misperceptions by WMB, were caused by the Debtor's eagerness to be as thorough as possible. Rather than trying to hide or lie about his assets, the Court believes the Debtor genuinely believed he was accurately filling out the 2016 PFS. As an unsophisticated businessman, his errors are understandable. Debtor was willing to provide more information as to every asset listed on the financial statement, yet WMB requested none. Taken together, the Court concludes that the Debtor did not submit the written financial statements to WMB with the intent to deceive.

III. Conclusion

The Court concludes that WMB failed to carry its burden of proof with respect to the single count of its complaint seeking to hold these debts nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). WMB was able to prove by a preponderance of the evidence that the Debtor obtained loans through a materially false financial statement. WMB was not, however, able to prove

by a preponderance of the evidence that it relied upon all of the terms, or that its reliance was reasonable under these circumstances. Several terms were clearly not relied upon, the real estate and the life insurance policies, while the reliance upon the Glenview and Unified Trust assets was not reasonable in light of the red flags and absence of even a minimal of investigation. Finally, WMB did not provide sufficient proof that the Debtor acted with an intent to deceive. Consequently, the Court cannot except these debts from discharge under 11 U.S.C. § 523(a)(2)(B).

      A separate Judgment consistent with this Memorandum Opinion will be entered this same date.

_____
Alan C. Stout
United States Bankruptcy Judge

Dated: June 3, 2022

UNITED STATES BANKRUPTCY COURT
FOR THE
WESTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| IN RE: | ) | |
| MAHESH AGRAWAL | ) | CASE NO. 20-30242 |
| | ) | |
| DEBTOR | ) | |
| | ) | |
| WILSON & MUIR BANK & TRUST COMPANY | ) ) ) | |
| PLAINTIFF | ) ) | |
| VS. | ) ) | ADVERSARY PROCEEDING NO. 20-3018 |
| MAHESH AGRAWAL | ) ) | |
| DEFENDANT | ) | |

**JUDGMENT**

Pursuant to the Court's Memorandum entered this date and incorporated herein by reference, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that judgment is rendered in favor of the Defendant, Mahesh Agrawal, and the debts the subject of this adversary proceeding are not excepted from discharge under 11 U.S.C. § 523(a)(2)(B).

This is a final and appealable order and there is no just reason for delay.

_____
Alan C. Stout
United States Bankruptcy Judge

Dated: June 3, 2022